oral argument not to exceed 15 minutes per side. Mr. Giddings, for the appellant, when ready. Mr. Giddings, for the appellant, when ready. I am James R. Giddings here on behalf of the plaintiffs and I wish to acknowledge the presence of co-counsel Donnely Hadden. It's a privilege to appear before this court today. Our clients wish to thank the court for permitting us to argue this matter. I also would like to preserve two minutes for rebuttal. Plaintiffs submit that the district court erred in this case in dismissing our claim under Rule 12b-6. Count 1, tortious interference, the district court improperly imposed a heightened pleading standards, which it said was needed to, quote, corroborate the improper motive of the interference. That's not correct. Federal judges are not permitted to do that, not permitted to require heightened pleading claims not listed in the first clause of Federal Rule Civil Procedure 9b. That's the rule of many cases, including the Supreme Court case of Swierkiewicz and Surima. The second sentence of 9b unequivocally states that, quote, malice, intent, knowledge, and other conditions of a person's mind may be alleged generally. There's only one Sixth Circuit Court of Appeals addressing the second sentence of 9b, and that's Vector Research versus Howard and Howard. And there they said, under Federal Rule of Civil Procedure 9b, malice, quote, may be averred generally. And I'm going to skip part of it. An attempted demonstration of malice in the complaint would in all likelihood be neither short nor plain. They're referencing Rule 8a there. We submit Vector Research is binding on the subsequent panels because it's never been overruled en banc in accordance with Sixth Circuit Rule 32.1b. Well, I thought that the complaint itself said that the reason Marathon was taking its actions was to expand its refinery. That's right. Why would they particularly want to target your client as, you know, an animating purpose for spending a billion dollars on their refinery? Well, there are two purported reasons. If they're going to expand the refinery, what they've done is buy out an entire area. Actually, that's imprecise. They have not. They've purchased some of the properties in the area, the residents. But if you're going to expand it, are you going to leave in your expanded area or your green zone a crumbled business here, vacant lot over there? It's kind of in the path. It's situated in the area of the proposed expansion. Why does that mean that they acted with malice towards your client's business as the reason for spending a billion dollars to expand their refinery? Well, actually, at this point, that discussion is premature because... But, I mean, your complaint elsewhere is saying Marathon did this for reasons X, Y, and Z. And isn't that today's solution of a reason that, frankly, makes zero sense whatsoever as a reason for spending a billion dollars on a refinery? Why can't the court sort of use that degree of sort of ordinary sense in reading the complaint? There's no factual predicate. One of the things that Marathon did throughout its submission, and the court said, this is legitimate. We don't know it's legitimate. In the Elias case, the plaintiffs conceded in their complaint that the undertaking was legitimate. We dispute that. We don't think their reasons are legitimate. The expansion may or may not be, except they have a long history of polluting this area. They've been sued repeatedly. They're currently subject to a consent decree for violating the federal environmental standards. So, can we automatically assume that somehow this is a legitimate undertaking? Please. We would prove... I'm just not clear about your use of the term legitimate. How are you using that term? That's one of the standards. Actually, that's a defense that is offered in cases for these kinds of activities. When you're doing tortious interference, the cases, for example, many Michigan cases talk about the legitimacy of the action. If you have a legitimate reason for what you're doing, that undercuts the possibility that the plaintiff or the injured party can claim that they were tortiously interfered with. It's a defense. So, in effect, you're saying their stated intention, which you allege to expand, is not undertaken in good faith, that they're spending this money for some purpose other than to expand, and you say it's to run your clients out of business. Well, we say this. We say there are several purposes. We argue there are several purposes. And in terms of malice, again, we do not have to submit a factual scenario to support that under the second sentence of 9b. But we say, yes, they may want to expand their refinery in this context, given their history. Is that legitimate? We dispute that. But we say, and we intend to prove, that one of their intentions with regard to the buyout program is to eliminate people from disputing their historical environmental infractions. What does that mean? They've been sued repeatedly for polluting. This is one of the worst areas in the state of Michigan. It's a terrible area, and they've blanketed the... Okay. So, are you saying they're just trying to get rid of people so they don't complain? That's one of the reasons. Okay. The other reason is, well, I guess one way to look at it, if I'm going to buy an ongoing business, you know, generating hundreds, like one of our plaintiffs, Kerry Korkus, had a grocery store in the heart of this area, in the heart of Oakwood. Now, which is a better way to get his business? Pay the current value of an ongoing and successful business, or force it into bankruptcy by wiping out his customer base? So your theory is that they're going to then repopulate Oakwood? They did. There were 1,200... Open a new grocery store. What's that? Your theory is that this is an effort to take over the grocery store or the trade by buying up all the residences, having those people move out, thereby lowering the cost of the grocery store, buying the grocery store at sale prices, and then reselling the residences and moving people back in, and then... No. It just... No. I'm not following. They want the area. They basically had a no-negotiating aspect of purchasing these residents. They want these people out, one, because they'll complain, two, because they want the property. Is that a legitimate reason? What's that? Would it be a legitimate reason for a refinery to buy my house because I'm always complaining about the air quality? Well, if... Would that be a legitimate reason for a refinery to buy my house, have me move somewhere else? It might not be. In this context, we submit that... Why would that not be legitimate? It depends on the facts of the case. That's our point. There's no factual predicate here. There is no fact. They have alleged nothing. They've never filed an answer. There's not an affidavit. There's not one shred of evidence in this record. And we will prove... File 12-B-6. We submit that their purpose was not just to acquire that grocery store, but to acquire all the property in the area, to suppress environmental claims from neighbors, businesses, whoever, that have historically been made, so they're not just after Mr. Korkus' little business, which actually is a pretty substantial business, but the bar down the street, other businesses situated there. If you strip the neighborhood of 1,200 residents and 400... 1,200 citizens, 1,200, 400 residents, that's going to affect those businesses. Right. It's going to reduce the cost to buy those businesses. Reduce it to nothing in some cases. I don't know about nothing. Well, in some cases, these people went bankrupt, and they acquire the property at a tax sale, a property, a business that might cost them $140,000 to buy, and they acquire it for $2,300 in a tax sale, if that. But we submit that we will show that that was their purpose, was to decimate the value of the businesses, decimate the value of the vacant properties there, and to eliminate, suppress valid environmental claims. Counsel, I'm sorry. It's, at least for me personally, one of the problems is that you're just arguing too many things, and too many of those things have problems. So when I read your complaint, and you're objecting to the fact that they offered these people non-negotiable contracts because they didn't want them to complain, I'm asking myself, well, first of all, why is that their problem? And secondly, what's wrong with that? I mean, there's nothing illegal in Marathon trying to buy out the area. So, I mean, I don't see it. I don't see why your client can, or anybody can, complain that they're trying to buy out the area to suppress complaints. Now, if you get a little bit further, and I'm not even sure if you're saying this, if you say that they had part of their plan to get it for the cheapest possible was to offer the money to the residents with the purpose of having them no longer be patrons of the businesses, and not offer it to the businesses, so that they could get all of those people not to buy there with the direct purpose of lowering the price and getting it for it's not the fair value of the property. And I'm not even sure if you're arguing that. Well, I am arguing that they wanted to suppress the value of those businesses, suppress the environmental claims, and suppress the value of the businesses. But when you say it's confusing, when you say suppress the environmental claims, it's like, how is that tortuous interference? I'm sorry, how is it? How is suppressing environmental claims tortuous interference with business? Well, the way they did it, we allege, is in a surreptitious way. I mean, if I have an environmental claim, ordinarily, one would expect that you'll come up, you've got an environmental claim, fine. Give us a release, we'll pay you $1,000, $5,000, $7,000 for your environmental claim. They didn't do that here. What they did is when they bought these properties, they had a program that discusses in the... Why does your client have standing to object to the fact that they bought people's property without giving them a kicker for their environmental claim? Well, they didn't advertise it, for one, that they were taking the environmental claims. We say that's an improper purpose, but the point is my client's business, they have standing because as a result of the buyout program, their business has been destroyed. They have no business. Some of them still are functioning, but they don't have it. It's destroyed as a result of this program to depopulate the area. They did not pay fair value. Okay, let's say they gave everybody an extra $5,000. Would your client be in a different position? Well, of course he might be, but that's a different factual scenario, and of course we have no record. There's no evidence. They've never filed an answer, so all of this is interesting, but it's a little bit speculative. It's more than speculative. Let's move to the nuisance. Can you tell me, do you think that you've properly pled nuisance? We think we did. I mean, we've been exposed for years, including the period of toxic chemicals. They're listed in the complaint, very detailed listing of the toxic chemicals down in the area. Part of the reason people left, we submit, was because of that. Part of the reason people did not do business with our clients is because of the ongoing historic pollution of this area. I mean, people really don't like to live where, and there are complaints. There's a long history of complaints with the MDEQ. We didn't get into that detailed factual scenario, and against Marathon for what they have done in terms of polluting the area. That's one of the reasons why they're subject currently to a consent decree by the federal government. After they got their permit, they're still in violation of federal law, and they're being monitored. Those chemicals, those nitrous oxides, are being breathed by the customers, breathed by the neighbors, affect their conduct. Of course, almost all of the neighbors are gone now. But the real point is this. If you want to use your rebuttal, you may, but otherwise your time is up for the first. Okay. Thank you, Your Honor. Thank you, sir. Thank you. We'll hear from Ms. Johnson. May it please the Court, Amy Johnson appearing on behalf of the Appalachee Marathon Petroleum Company. I think Mr. Giddings said it correctly when he stood before you and said there's no factual predicate to this case. There have been no facts alleged in this case. In fact, when he stood up here and told you that there was a grocery store involved in this case, perhaps the caption might say that, but there's no allegation that any of the plaintiffs actually owns or operates a grocery store. The plaintiffs didn't even give us the basic rudimentary facts within their control. We don't even have their addresses. We don't know. They say that they were located in or around Oakwood Heights, but they don't give us the property. The caption tells us, the caption of this case tells us that two of the businesses were formerly businesses. We don't know when they stopped doing business. We don't know what type of business they did. We don't know if their business is the type of business that gives off emissions, could be an auto shop, could be an auto repair shop. We are simply left with nothing. We're left to guess. We would submit Judge Duggan got it right. The district court looked at the Second Amendment complaint and determined that there were no allegations, there were no factual allegations to support the claim, and that's exactly the case here. I would also submit, Mr. Giddings said there was no case that addressed Rule 9 other than vector research, this 1996 case. I wholeheartedly disagree. The U.S. Supreme Court addressed Rule 9 in the context of Rule 8 pleading standards, and in the Ibqual case specifically held that a plaintiff cannot avoid the strictures of Rule 8 by merely claiming that they only need to plead malice, intent, or knowledge generally, and that's exactly what the plaintiffs are trying to do here. Well, they're giving facts. I mean, the complaint basically says that Marathon wanted to expand and wanted to pollute and so wanted to get rid of the neighbors so they could do so freely and in effect took the tack where they were going to pay the residents and figured that'll get rid of the businesses. The Second Amendment complaint, Your Honor, as I read it, the only allegation that says why Marathon purportedly instituted the Oakwood Heights property purchase program was to, quote, preempt claims. That's in paragraph 11. And as the court has noted, to preempt claims, any business that attempts to preempt claims, that's a legitimate business interest. And as the appellants agree, a legitimate business inference vitiates any type of plaintiff. Right, but are you saying that it's impossible to read the complaint as alleging that? I agree there's a lot of extraneous matter in there that one could understand as intending to allege ill deeds but really don't stand up. But included in there, are you saying one cannot read that as saying that part of the plan was to pay the residents to leave with the intent that they no longer frequent the business establishments and therefore they will be able to get the property, the business property, for a very low value? Yes, I am saying that that is not a fair reading of the complaint. There's conclusory allegations which are to be given the credit of truth. But there's no allegation that Marathon undertook the property purchase program with the intent of harming these plaintiffs. And I think the Elias case that we cited is really instructive. In the Elias case, Freddie Mac put the plaintiff on a list. Freddie Mac actually took an affirmative act and did something with respect to this plaintiff. And the court still held that that was not enough to show that Freddie Mac put that plaintiff on the list in order to interfere with plaintiff's businesses. In this case, there's nothing in the Second Amendment complaint that says that Marathon undertook an act for these specific plaintiffs to run these plaintiffs out of business. And again, we don't even know what types of businesses these are. But there's nothing to note acts, there's no facts, there's nothing for us to legitimately infer that Marathon undertook an entire Oakwood Heights property purchase program for the purpose of interfering with the business of these plaintiffs. It wouldn't have to be the purpose of the expansion. I mean, within a legitimate purpose, you could have a sub-purpose that was illegitimate or an illegitimate means. And what about the nuisance? I mean, there's allegations that are obviously very plausible that you're putting up all of these admissions. When you filed the paper, there was an admission that the admissions would increase. There's been some EPA activity that validates that allegation. I mean, we're talking about a pleading. What more did they need to plead on nuisance? I'm glad that you raised that, Your Honor. It's important to keep in mind the nuisance condition that they allege that the specific plaintiffs in this case allege is the refinery expansion which, according to their pleading, became operational in November of 2012. And they allege, and they only allege, Your Honor, that that expansion, quote, increased emissions. Did not significantly. They don't even allege it significantly increased, but only increased emissions. It's interesting that the plaintiffs allege that earlier, and this is based on their pleading, earlier the EPA filed an action naming Marathon as a defendant. But there is no allegation that that claim had anything to do with emissions, had anything to do with the refinery expansion, had anything to do with what plaintiffs claim is the nuisance in this case because they also allege that case was settled months before the expansion went into effect. Right. So, logically, it would be that that case has nothing to do with the refinery expansion. No. Or DEHOOP. Well, I didn't read it that way. I read it that, yes, that was a prior action, prior penalty, and now you're putting out even more with the expansion. Even the complaint alleges that that was settled. There were no findings of fact in that. The case was filed before the expansion ever occurred. Take that away. I mean, I'm just, okay, so forget about that. It says that you're emitting all of these pollutants and that it's affecting their, it's making them uncomfortable. It's their noxious fumes. It's keeping people away from the business. I mean, what more do they need at the pleading stage? They actually don't allege that, Your Honor, and I would say that their nuisance claim is particularly scant. And, in fact, when they filed their first amended complaint and we filed a motion to dismiss, we had oral argument on that specific, you know, on the legitimacy and the allegations. And the lower court specifically questioned the plaintiffs on this, and the transcript of the hearing is clear. The plaintiff's lawyer says, and I quote, we'd be happy to amend that portion, the nuisance portion, of our claim to explain with greater clarity exactly what our claims are and how they flow from the changed situation by Marathon Petroleum. The lower court granted leave to amend. When you compare the first amended complaint to the second amended complaint, the nuisance counts are identical. There's no new allegations. There's no change in anything. They certainly don't allege how this expansion has affected them in any way or how it's a significant effect from how things were before. And it's plaintiff's specific contention in this case, that it's the refinery expansion that created the nuisance condition, but they don't tell us. There's no facts to say how these plaintiffs were affected. And the Michigan Supreme Court took great care to say not every nuisance is actionable. In the Adkins case that we cited, the Michigan Supreme Court said, it has to be significant interference. It has to be unreasonable. It has to be substantial. And if it's not, it's not actionable. And we would submit there's no facts in this complaint to infer that these plaintiffs suffered any significant or substantial interference. Any further questions? Very well, thank you. Thank you, Your Honors. Just I want to clarify a couple things. When she says we asked to amend the complaint at the motion on our first amended complaint that we were going to amend with regard to nuisance, it's absolutely untrue. The transcript does not reflect that. The discussion came up about malice and the sufficiency of our allegation of malice, and we amended for that purpose. With regard to nuisance specifically, Wyer's case, the Supreme Court says, fumes alone. And whether the extent to which you're affected is a matter of proof, not pleading. And so we submit that our nuisance claim is sufficient. Given the language of Bell Atlantic, plausible, straightforward, simple. What's that? Your complaint confined to the increase in pollution after they started the activity, the added activity, the expansion? That's correct. Okay. The additional environmental insult, if you would. The other thing is, again, they keep wanting to talk about evidence of rule 9B is clear. Yeah, but Iqbal's clear, too, and you can't just make a conclusory allegation of an element, even if that element is maliciousness. Well, actually the argument is we don't see a whole lot of other indication of malice towards your client in particular. Well, they left, when they quoted from Iqbal in the district court, they quoted Iqbal here in terms of the relationship between 8A, 9B. They left out a quote without any reference whatsoever. Disingenuously, we suggest the following. This is in Iqbal. A rigid rule requiring detailed pleading of a condition of mind would be undesirable because absent overriding considerations pressing for a specificity requirement, as in the case of a vermin of fraud or mistake, the quote general short statement, short and plain statement of the claim mandate of rule 8A should control the second sentence of 9B. We're talking about the second sentence of 9B. All right. Now, we understand that point. Your time is up. But Iqbal does not say what they're suggesting. Okay. Your time is up. Any further questions? All right. Thank you for your arguments. Thank you, Your Honor. Both sides. Thank you very much. The case will be submitted. Clerk may call the next case.